FILED
2021 Mar-09  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID SHEARRER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 2:19-cv-01062-JHE |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

Plaintiff David Shearrer ("Shearrer") brings this employment action against Defendant Norfolk Southern Railway Company ("Norfolk Southern") pursuant to the anti-retaliation provisions of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109(a)-(b). (Doc. 1). Shearrer alleges that Norfolk Southern retaliated against him for reporting safety concerns and filing an OSHA complaint by searching his personal belongings, placing him on a medical hold, denying him a position, and removing chairs, tools, and a TV from an office. (*See id.*). Norfolk Southern has moved for summary judgment. (Doc. 40). Shearrer filed a response in opposition to the motion, (doc. 43), and Norfolk Southern filed a reply, (doc. 44). The motion is fully briefed and ripe for review. For the reasons stated below, the motion for summary judgment is **GRANTED**.

### I. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 8).

to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

2

## II. Summary Judgment Facts

Shearrer has worked for Norfolk Southern as a carman in various capacities since 2003. (Doc. 42-7 at 4 (11:3-5)).  Generally, a carman is responsible for the safe operation of railcars and related equipment.  (Doc. 42-4 at 2, ¶ 2; Doc. 42-5 at 5 (10:25-11:3)).  Shearrer currently works for Norfolk Southern as a Working Gang Leader ("WGL") at Norfolk Southern's railyard in Birmingham, Alabama.  (Doc. 42-7 at 4 (10:3-6)).  A WGL is responsible for performing mechanical inspections, conducting a limited number of repairs, billing repairs, and performing lead man duties.  (Doc. 42-4 at 2, 8, ¶¶ 2, 20(e)).

Carmen work in three shifts at Norfolk Southern: first-shift during the day, second-shift during the late afternoon and evening, and third-shift during the night and early morning.  (*See* doc. 42-4 at 11).  Sometime during Fall 2015, when Shearrer was working as a WGL at Norfolk Southern's railyard in McCalla, Alabama, he told two of his supervisors, Jordan Murphy ("Murphy") and Thomas Wynne ("Wynne"), that having only one third-shift carman was not safe. (Doc. 42-7 at 11 (37:6-40:14)).  Shearrer testified that a third-shift carman sometimes would have to conduct tests on and repair multiple 5,000-foot trains by himself, which Shearrer described as the work of two carmen and a safety risk.  (*Id.* at 7, 11 (24:2-22, 38:5-16, 40:5-11)).

In early February 2016, Norfolk Southern investigated some employee's allegations of discriminatory statements made by Murphy.  (Doc. 42-7 at 32 (123:15-124:22)).  When interviewed, Shearrer told investigators that he had heard Murphy say, "I've got eighteen people right now that are useless to me," referring to employees at Norfolk Southern's Birmingham yard. (*Id.* at 33 (125:15-16)).

On February 4, 2016, Murphy sent an email to Shearrer requesting input on work at the McCalla yard.  (Doc. 42-4 at 3, ¶ 6).  The email itself does not appear in the record, but Murphy

described his email as a "request for [Shearrer's] suggestions on improvements for the McCalla operations." (*Id.*). Shearrer described the email as Murphy "ask[ing] for some input about McCalla and the way the work shift flowed." (Doc. 42-7 at 9 (31:23-32:2)).

On February 6, 2016, Shearrer responded to Murphy's email with several suggestions about the workflow at the McCalla yard. (Doc. 42-6 at 53). Shearrer recommended that Norfolk Southern assign two third-shift WGLs, one from 10:00 p.m. to 6:00 a.m., and another from 11:00 p.m. to 7:00 a.m. (*Id.*). Shearrer also suggested specific duties for the different shifts to complete. (*Id.*). His email did not mention safety. (*See id.*).

Murphy thanked Shearrer "for [his] input" and emailed two other carmen, Jordan Carroll ("Carroll") and Michael Layman ("Layman"), asking if they had "any suggested changes that would improve the current operation at McCalla." (Doc. 42-6 at 54). Shearrer discussed with Carroll and Layman "what [they] thought would be the best way to handle situations as far as workflow and keep everything running smoothly to move freight." (Doc. 42-7 at 9 (31:14-21)). On February 11, 2016, Layman responded to Murphy's email with workflow suggestions similar to those made by Shearrer, but, unlike Shearrer, Layman also mentioned in his email that having only one third-shift carman was a safety hazard. (*Id.* at 75). Layman copied Shearrer, Carroll, and others on the email. (*Id.*).

The parties dispute the events of February 26, 2016, but Shearrer describes that day as follows. When he arrived for his shift, he brought in a duffle bag containing a sleeping bag, a pillow, clothes, and toiletries because he was planning to depart for a weekend church retreat after his shift ended. (Doc. 42-7 at 17 (62:4-63:9)). After finishing his shift at 7:00 a.m., Shearrer was preparing to shower and change clothes behind a locked door in the locker room. (*Id.* at 17 (63:21-64:1)). Murphy and Wynne entered the locker room and Wynne asked Shearrer what he was

doing.  (*Id.* at 17 (64:18-20)).  Shearrer explained that he was planning to stay there until he left for his retreat.  (*Id.* at 17 (64:20-23)).  Wynne disapproved, so Shearrer left.  (*Id.* at 17-18 (64:23-65:5)).  Shearrer returned fifteen minutes later because he forgot to collect his lunchbox.  (*Id.* at 18 (65:6-10)).  When he returned, he saw that Murphy and Wynne had taken Shearrer's medicine out of his lunchbox and spread the medicine out on a shelf.  (*Id.* at 18 (65:10-13)).  Murphy and Wynne asked Shearrer about the medicine, and Shearrer explained that he took the medicine for sleep apnea.  (*Id.* at 18 (66:3-11)).  Shearrer said "third shift sucks," but he did not say that he had trouble staying up through the night or that his sleep apnea affected his ability to work.  (*Id.* at 18 (66:12-14, 66:20-68:16)).

Murphy told a different story that ultimately served as a basis for placing Shearrer on a medical hold.  In a memorandum dated February 26, 2016, Murphy stated that he and Wynne discovered Shearrer asleep behind a locked door in the locker room.  (Doc. 42-7 at 79).  According to the memorandum, Murphy told Shearrer that it was unacceptable to sleep at the work place and dangerous to lock himself in.  (*Id.*).  Murphy stated that he then saw Shearrer leave with duffle bags, a sleeping bag, and a pillow, and saw Shearrer's medicine left out in the open.  (*Id.*).  According to Murphy, Shearrer said his sleep apnea made it difficult for him to stay awake through the night.  (*Id.*).  Based on this interaction, Murphy recommended that Norfolk Southern's Health Services Department evaluate Shearrer's fitness for service.  (*Id.* at 80).

On February 29, 2016, Vickie Lorraine Carroll-White ("Carroll-White"), who worked in the Health Services Department, reviewed the memorandum from Murphy and decided to temporarily remove Shearrer from service on a medical hold.  (Doc. 42-5 at 5-6 (12:17-14:11)).  Based on Murphy's memorandum, Carroll-White was concerned whether Shearrer's symptoms related to sleep apnea, his strong urge to sleep, his need for medicine to stay awake, and the

presence of a sleeping bag and pillow showed that he struggled to stay awake during the night. (*Id.* at 6-7 (14:15-15:6, 17:10-18:6)).

Carroll-White instructed Shearrer to have his treating doctor provide documentation on the status of his sleep apnea.  (Doc. 42-5 at 46).  Shearrer's physician, Dr. Mark Tafazoli ("Tafazoli"), sent a letter to Norfolk Southern on March 2, 2016 informing the company that Shearrer was "currently under treatment for obstructive sleep apnea, restless leg, periodic leg movement disorder, and circadian shiftwork disorder."  (*Id.* at 47).  Tafazoli also stated that Shearrer was "medically cleared to return to work without restrictions . . . with the current treatment combination of APAP, semi-compliant, and current regiment of medication."  (*Id.*).

After receiving more records from Tafazoli, on March 7, 2016, the Health Services Department removed the medical hold and permitted Shearrer to return to work.  (Doc. 42-5 at 49).  The medical hold lasted eight days, including five working days during which Shearrer would have earned $1,463.40.  (Doc. 42-7 at 30-31 (115:5-119:15)).

At some point behind the scenes of these events, Murphy and Wynne removed chairs, tools, and a TV from the office at the McCalla yard.  (Doc. 42-7 at 42 (163:12-164:20)).  They removed the rolling office chairs and replaced them with folding chairs.  (*Id.* at 42 (163:12-13)).  They removed the TV even though it had been used for safety meetings.  (*Id.* at 42 (164:1-14)).  The tools they removed helped with carmen work.  (*Id.* at 42-43 (164:15-165:10)).

On August 24, 2016, Shearrer filed his first OSHA complaint under the whistleblower protections of the FRSA.  (Doc. 42-1).  In his complaint, Shearrer asserted that he engaged in protected activity under the FRSA by sending his February 6, 2016 email to Murphy, by meeting with Carroll and Layman about workflow, and by Layman sending the February 11, 2016 email to Murphy, which Shearrer characterized as the three carmens' joint input on safety.  (*Id.* at 2).  He

6

alleged the events of February 26, 2016, his medical hold, and Murphy and Wynne removing chairs, tools, and a TV as retaliatory adverse actions.  (*Id.* at 2-3).

The following year, on May 10, 2017, Norfolk Southern shut down its McCalla yard.  (Doc. 43-1 at 5, ¶ 3).  Shearrer was given sixty days-notice of this fact, so he planned to transfer to the Birmingham yard as a WGL for the repair track after the shutdown.  (*Id.* at 5-6, ¶¶ 3-4).  Shearrer's immediate supervisor, Chris Barnes ("Barnes"), and Norfolk Southern management told Shearrer he would not have to take a competency test for the WGL position at the Birmingham yard because Shearrer was already WGL-qualified.  (*Id.* at 5-6, ¶ 4).  In fact, Shearrer worked as the WGL on the repair track at the Birmingham yard in 2012.  (*Id.* at 6, ¶ 6).

Shearrer finished his final shift at the McCalla yard at 7:00 a.m. on May 10, 2017.  (Doc. 43-1 at 5, ¶ 3).  At that time, Murphy told Shearrer to report to the Birmingham yard.  (*Id.*).  Murphy told Shearrer he would have to take a "small test . . . that [he] would have no problem passing," but Murphy did not tell Shearrer when the test would be administered.  (*Id.*).

Shearrer arrived at the Birmingham yard and, at 9:30 a.m., was instructed to take the WGL test there.  (Doc. 43-1 at 5, ¶ 3).  He took the test but did not pass it.  (Doc. 42-4 at 5, ¶ 12).  Shearrer still worked as a carman at the Birmingham yard, (*id.* at 8, ¶ 20(e)), but he was not a WGL there until July 2018, (doc. 42-7 at 31 (118:4-12)).

On October 4, 2017, Shearrer amended his OSHA complaint to allege that Norfolk Southern retaliated against him for engaging in protected activity by giving him the WGL test he was told he would not have to take; he alleged that the test was a pretext to not give him the WGL job.  (Doc. 42-2 at 2).

OSHA completed its investigation of Shearrer's allegations of retaliation on August 14, 2018 and, on August 14, 2018, found no evidence of retaliation.  (Doc. 42-3 at 3-4).  This lawsuit

followed.

### III. Analysis

Shearrer's complaint asserts a single cause of action for retaliation under the FRSA, 49 U.S.C. § 20109(a)-(b).  (Doc. 1 at 5).  The FRSA prohibits railroad carriers from taking adverse actions against employees who participate in any of several enumerated protected activities regarding railroad safety.  *See* 49 U.S.C. § 20109(a)-(b).  The protected activities most pertinent to this case are "to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security," 49 U.S.C. § 20109(a)(1), "to file a complaint . . . related to the enforcement of [the FRSA]," 49 U.S.C. § 20109(a)(3), and "reporting, in good faith, a hazardous safety or security condition," 49 U.S.C. § 20109(b)(1)(A).

District courts in the Eleventh Circuit analyze FRSA retaliation claims under the four-element test established by the Third Circuit in *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013).[2]  *See Powell-Coker v. Norfolk S. Ry. Co., Inc.*, 2018 WL 5116837, at *3 (N.D. Ala. Oct. 19, 2018); *Weeks v. Norfolk S. Ry. Co.*, 2017 WL 4102738, at *2 (M.D. Ga. Sept. 15, 2017); *Head v. Norfolk S. Ry. Co.*, 2017 WL 4030580, at *11 (N.D. Ala. Sept. 13, 2017); *James v. CSX Transportation Inc.*, 2017 WL 2471828, at *5 (M.D. Ga. Feb. 21, 2017); *Morgan v. Norfolk S. Ry. Co.*, 2014 WL 3891984, at *2 (N.D. Ala. Aug. 8, 2014).  Pursuant to that test, a successful retaliation claim under the FRSA requires proof of four elements: (1) the employee engaged in an activity protected by the FRSA; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an adverse employment action; and (4) the

---

[2] The Eleventh Circuit has not adopted a specific test for FRSA retaliation claims.

protected activity was a contributing factor in the adverse employment action.  *Araujo*, 708 F.3d at 157.[3]

Here, Shearrer engaged in protected activity by filing his OSHA complaint on August 24, 2016, and amending it on October 4, 2017.  *See* 49 U.S.C. § 20109(a)(1) (protecting employees who "file a complaint . . . related to the enforcement of [the FRSA]").

Also, evidence supports a reasonable inference that Shearrer engaged in protected activity when, in Fall 2015, he reported his safety concern about having only one WGL work the third shift.  *See* 49 U.S.C. § 20109(b)(1)(A) (protecting employees who "report[], in good faith, a hazardous safety or security condition").  Norfolk Southern argues that the Court must disregard any report Shearrer made in Fall 2015 because he did not mention it in his OSHA complaint or amendment and therefore failed to exhaust his administrative remedies before filing suit.  (Doc. 41 at 33-35).  The undersigned disagrees.  An employee exhausts his administrative remedies "if the civil claim grows out of or is like or reasonably related to the substance of the allegations in the administrative charge," the undersigned must construe OSHA complaints liberally, and the undersigned may consider a civil action "as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination."  *Head*, 2017 WL 4030580, at *13 (quotations omitted) (citing *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 899 (D. Minn. 2015)) (quoting in turn *Fanning v. Potter*, 614 F.3d 845, 851-52 (8th Cir. 2010), and *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 673 (8th Cir. 1994)).  Shearrer's report in Fall

---

[3] These elements come from the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century, 42 U.S.C. § 42121(b) ("AIR21").  The burdens of proof found in AIR21 apply to FRSA retaliation claims.  49 U.S.C. § 20109(d)(2)(A)(i) ("Any [retaliation action] shall be governed by the legal burdens of proof set forth in [AIR21].");  *see* 29 C.F.R. § 1979.104(b)(1) (setting out the same elements for an AIR21 retaliation claim as those set out in *Araujo* for a FRSA retaliation claim).

9

2015 that having only one third-shift WGL was dangerous is reasonably related to his February 2016 recommendation for a work schedule that provided for two third-shift WGLs, and an expectation that the OSHA investigation would uncover the report is reasonable.  The undersigned will consider Shearrer's sworn testimony on the matter.

Shearrer's retaliation claim does not withstand the remaining elements of the *Araujo* test. First, to the extent that Shearrer alleges Murphy and Wynne going through his medicine and removing the chairs, tools, and TV as individual adverse employment actions, his retaliation claim relying on those actions fails.  The Eleventh Circuit has not adopted a special definition of "adverse employment action" in the context of a FRSA retaliation claim, but, in a case involving a retaliation claim governed by the same burden of proof as a FRSA retaliation claim, the Eleventh Circuit has relied on the familiar principles of what constitutes an "adverse employment action" under Title VII of the Civil Rights Act of 1964.  *See Jacobs v. U.S. Dep't of Labor*, 806 F. App'x 832, 835 (11th Cir. 2020) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006), and *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)).[4]  In the Title VII retaliation context, an adverse employment action is one that "produces an injury or harm" and would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 67-68 (quotation and citation omitted).

Here, supervisors going through an employee's medication, though an invasion of privacy, fails to meet the standard of a material adverse employment action.  *See Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1326 (11th Cir. 2020) (receiving negative monthly evaluations does not

---

[4] *Jacobs* involved a retaliation claim brought under the Surface Transportation Assistance Act, 49 U.S.C. § 31105 ("STAA").  STAA retaliation claims, like FRSA retaliation claims, are governed by the burdens of proof found in AIR21, 42 U.S.C. § 42121(b).  49 U.SC. §§ 20109(d)(2)(A)(i), 31105(b).

constitute a material adverse employment action). Removing better chairs, helpful tools, and a TV is even less so a material adverse employment action.

Evidence does support a reasonable inference that Shearrer suffered two adverse employment actions: losing five days' worth of pay while on a medical hold and being denied the WGL position at the Birmingham yard. A reasonable jury could find that those consequences would dissuade an employee from reporting safety concerns. However, as explained below, Shearrer's retaliation claim based on those actions fails for lack of evidence that his protected activity was a contributing factor to those actions.

Under the FRSA, protected activity is a "contributing factor" to an adverse employment decision if it, "'alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" *Morgan*, 2014 WL 3891984, at *5 (quoting *Araujo*, 708 F.3d at 158) (quoting in turn *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 567 (5th Cir. 2011)). Here, no evidence shows that Shearrer's report of safety concerns affected in any way Norfolk Southern's decision to place him on a medical hold. Carroll-White was the only employee involved in the initial medical hold decision on February 29, 2016, (doc. 42-5 at 5-6 (13:21-14:14)), and no evidence shows that she was aware of Shearrer's safety report made only to Murphy and Wynne in Fall 2015. In making her decision, Carroll-White reviewed Murphy's memorandum of finding Shearrer asleep on February 26, 2016, (*id.* at 6 (14:4-8)), but that memorandum did not mention Shearrer's safety report or any other protected activity, (*see* doc. 42-7 at 79). Additionally, Shearrer's own doctor confirmed the reason why Carroll-White placed Shearrer on medical hold; Dr. Tafazoli informed Norfolk Southern during the medical hold that he was then treating Shearrer for circadian shiftwork disorder. (Doc. 42-5 at 47).

In his response to Norfolk Southern's motion for summary judgment, Shearrer attempts to

impute Murphy's or Wynne's alleged retaliatory motives to Carroll-White.  (Doc. 43 at 21-22).

According to Shearrer, by relying on Murphy's allegedly false and retaliatory report of the events

of February 26, 2016, Carroll-White's decision "was merely a conduit for the retaliatory animus

of Murphy and Wynne submitting a false report, i.e., the 'cat's paw theory.'"  (*Id.*) (internal

quotation marks and footnote omitted).  The Supreme Court has explained the cat's paw theory of

liability as follows: "When a decision to fire is made with no unlawful animus on the part of the

firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by

discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the

decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 418-19 (2011).  *See also Sims v. MVM, Inc.*, 704

F.3d 1327, 1337 (11th Cir. 2013) ("[T]o prevail [on a cat's paw theory], Sims must prove that

Davis's animus was a 'but-for' cause of, or a determinative influence on, Perkins' ultimate

decision.").  But the traditional formulation of the cat's paw theory does not fit comfortably in this

case because a plaintiff does not have to prove retaliatory animus to prevail on a FRSA retaliation

claim.  Rather, he need only show that his protected activity played any part—i.e., was a

"contributing factor"—in the adverse employment decision.  *See Araujo*, 708 F.3d at 158.

Shearrer does not need to show that Carroll-White was a conduit for Murphy's retaliatory

animus.  Instead, Shearrer needs to show that his protected activity played any part in Murphy's

decision to write the February 26, 2016 memorandum.  If so, then Shearrer's protected activity

would necessarily be a contributing factor to Carroll-White's medical hold decision.

But Shearrer has failed this even lighter burden of proof.  Shearrer offers no evidence that

reporting his safety concern in Fall 2015 was a contributing factor to Murphy's report of the events

of February 26, 2016.  According to Shearrer, the temporal proximity between his protected

activity and February 26, 2016 supports a reasonable inference of causation on its own.  (Doc. 43

12

at 23-24).  It is true that temporal proximity can, given the circumstances, satisfy the burden of proving a contributing factor.  *See* 29 C.F.R. § 1979.104(b)(2) ("Normally the burden [of proving a 'contributing factor'] is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action.").  However, February 26, 2016 is not close enough to the Fall 2015 to raise a reasonable inference of causation.  *See also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (in the Title VII context, "mere temporal proximity, without more, must be 'very close.' . . .  A three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough.") (citations omitted).

Shearrer then argues that he has actually offered evidence of temporal proximity as close as a few weeks because, according to him, he engaged in protected activity on February 4, 2016, February 6, 2016, and February 11, 2016.  (*See* doc. 43 at 12-14, 23-24).  Shearrer is again incorrect.  On February 4, 2016, Shearrer told ethics complaint investigators that he had heard Murphy call eighteen employees "useless."  (Doc. 42-7 at 33 (125:15-16)).  Shearrer did not raise any safety concerns and participating in an internal ethics investigation unrelated to safety is not activity protected by the FRSA.  *See* 49 U.S.C. § 20109(a)(1) (protecting employees who participate in investigations regarding railroad safety or security).

On February 6, 2016, Shearrer sent Murphy an email suggesting several changes to the carman workflow at the McCalla yard.  (Doc. 42-6 at 53).  Shearrer did not mention any safety concerns in his email, thus his email is not a "good faith" report of "a hazardous safety or security condition" protected by the FRSA.  *See* 49 U.S.C. § 20109(b)(1)(A).

Finally, on February 11, 2016, Layman, not Shearrer, sent an email to Murphy mentioning a safety concern.  (Doc. 42-7 at 9).  Shearrer argues that Layman's email can be Shearrer's

protected activity because Layman sent his email after meeting with Shearrer, Layman sent the email in response to Murphy's request made after Shearrer sent his own email to Murphy, and Layman copied Shearrer on the email.  (*See* doc. 43 at 22).  Shearrer considers the email a kind of joint input on safety.  (*See id.*).  This strained argument fails to show a genuine issue of material fact sufficient to preclude summary judgment.  First, the meeting between Shearrer and Layman did not concern safety; Shearrer testified that the meeting concerned workflow only.  (Doc. 42-7 at 9 (31:14-21)).  Second, Murphy's first email to Shearrer and the follow-up email to Layman asked only for workflow suggestions.  (Doc. 42-4 at 3, ¶ 6; doc. 42-6 at 54; doc. 42-7 at 9 (31:23-32:2)).  Murphy did not ask about safety or ask Layman to confer with Shearrer and then report their concerns.  Third, Layman copying Shearrer on the email is not material.  Finally, no law provides that implicitly endorsing the content of another's protected activity is always itself protected activity.  Therefore, Shearrer did not engage in protected activity in February 2016, so he lacks evidence of temporal proximity to raise a genuine dispute of causation.  Norfolk Southern is entitled to judgment as a matter of law as to the retaliation claim based on the medical hold.

The second adverse employment action, Norfolk Southern's failure to give Shearrer the WGL position at the Birmingham yard in May 2017, occurred after Shearrer engaged in more protected activity by filing his OSHA complaint on August 24, 2016.  Like his retaliation claim based on the medical hold, his retaliation claim based on the WGL position fails for lack of a genuine dispute of causation.

Shearrer argues that his OSHA complaint contributed to his failure to receive the WGL position because of the temporal proximity between the date he filed the complaint, August 24, 2016, and the time Norfolk Southern started to shut down the McCalla yard, March 10, 2017.  (Doc. 43 at 24-25).  The six and a half months between those two events is not sufficiently close

temporal proximity to raise a genuine dispute of causation.  *See Thomas*, 506 F.3d at 1364.  Perhaps recognizing this obstacle, Shearrer contends that OSHA was still investigating his complaint in March 10, 2017, (doc. 43 at 24), so he apparently argues that he was engaging in protected activity for the whole duration of the OSHA investigation.  The filing of an OSHA complaint and participating in an OSHA investigation into railroad safety is protected activity; the existence of an OSHA investigation is not.  *See* 49 U.S.C. § 20109(a)-(b).

Shearrer then points to what he considers suspicious circumstances surrounding the May 2017 WGL test that, according to him, show that Norfolk Southern set him up to fail in retaliation for filing an OSHA complaint.  (*See* doc. 43 at 25-26).  Those circumstances are (1) Barnes told Shearrer he would not have to take a WGL test; (2) Murphy told Shearrer to go to the Birmingham yard as soon as his last shift at the McCalla yard ended; (3) Murphy told Shearrer that he would have to take a small test he would have no trouble passing; (4) Norfolk Southern made Shearrer take the test shortly after he arrived at the Birmingham yard; and (5) the test asked questions about subjects that were not included in other employees' tests.  (*See* doc. 43 at 9, 25-26) (citing doc. 43-1 at 5-6, ¶¶ 3-5, and doc. 42-7 at 25-27).  These circumstances do not support a reasonable inference of a causal link between Shearrer's OSHA complaint and his failure to receive the WGL position.

To demonstrate why Shearrer's argument fails, the undersigned begins with the duty at summary judgment to construe the evidence—particularly Shearrer's affidavit describing the five circumstances identified above, (*see* doc. 43-1 at 5-6, ¶¶ 3-5)—in the light most favorable to him, and infers that Norfolk Southern did, in fact, set him up to fail by ensuring he would not study for a test, luring him in to a false sense of security, and then surprising him with an unfairly difficult test.  But, even if this inference is true, Shearrer's burden is not to prove that his employer took an

egregiously unfair act against him; his burden is to prove that his *protected activity* was a *contributing factor* to that egregious act.  Again, no evidence connects the dots between Shearrer's August 2016 OSHA complaint and the May 2017 WGL position, so no reasonable jury could find that his protected activity contributed in any way to his failure to receive the WGL position.[5] Therefore, Shearrer's retaliation claim based on his failure to receive the WGL position in May 2017 fails for lack of a genuine dispute of causation, and Norfolk Southern is entitled to judgment as a matter of law on that claim.

### IV. Conclusion

For the reasons stated above, the undersigned finds there is no genuine issue of material fact, and Norfolk Southern is entitled to judgment as a matter of law.  Norfolk Southern's motion for summary judgment, (doc. 40), is **GRANTED**.  A separate order will be entered.

DONE this 9th day of March, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[5] The undersigned emphasizes that Shearrer has not been held to any causation standard found in Title VII or other non-FRSA employment retaliation statutes.  The FRSA contains a lighter causation standard than does Title VII.  Under Title VII, a plaintiff must prove that her employer discriminated against her *because* of her protected activity, whereas, under the FRSA, the plaintiff must prove only that her protected activity was a "contributing factor" to discrimination, i.e., played *any part* in affecting the adverse employment action.  *Compare* 42 U.S.C. § 2000e–3(a), *with* 49 U.S.C. § 20109(a)(2).  *See Araujo*, 708 F.3d at 158 (comparing the two standards); *Morgan*, 2014 WL 3891984, at *5 (same); *see also Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) ("The words 'a contributing factor' . . . *mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision*. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action.") (emphasis in original) (quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20)).  In this case, with a complete lack of evidence of causation, Shearrer has simply failed the lighter burden of proof found in the FRSA.